**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 29 2012, 9:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DEIDRE L. MONROE**
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEES
INDIANA DEPARTMENT OF CHILD
SERVICES:

**EUGENE M. VELAZCO, JR.**
DCS, Lake County Office
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

LAKE COUNTY COURT APPOINTED
SPECIAL ADVOCATE:

**DONALD W. WRUCK**
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
C.C., Minor Child, )
    )
C.C., Mother, )
    )
    Appellant-Respondent, )
    )
    vs. )    No. 45A04-1110-JT-591
    )
INDIANA DEPARTMENT OF CHILD )
SEVICES, )
    )
    and )
    )
LAKE COUNTY COURT APPOINTED )
SPECIAL ADVOCATE, )
    )

Appellees-Petitioners.                                          )

---

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Judge
Cause No. 45D06-1103-JT-75

---

**June 29, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

C.C. ("Mother") appeals the involuntary termination of her parental rights to her child, C.C. Concluding that there is sufficient evidence to support the juvenile court's judgment, we affirm.

**Facts and Procedural History**

Mother is the biological mother of C.C., born in June 2007.[1] The evidence most favorable to the juvenile court's judgment reveals that in November 2008, the local Lake County office of the Indiana Department of Child Services ("LCDCS") received a referral from the Gary Police Department indicating one-year-old C.C. may be in need of services. LCDCS initiated an assessment, and case manager James Webb ("Webb") located C.C. at his maternal grandmother's ("Grandmother") home. During the assessment, Grandmother told Webb she "did not want to care for [C.C.] any longer" and that she was "tired of her daughter leaving [C.C.] with her." State's Exhibit E at 3. Grandmother further reported that this was the fourth time in less than a year that Mother

---

[1] The parental rights of C.C.'s alleged biological father, C.P. ("Father"), were terminated by the juvenile court in its September 2011. Father does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

2

had left C.C. with her for an extended period of time and that Mother was a drug addict. Webb observed, however, that Grandmother "appeared to be on drugs," was "very uncooperative," and did not have a bed in the home for C.C. Id. Police personnel also informed Webb that they had responded to multiple domestic disputes calls at the family home in the past involving Grandmother and Mother.

Webb telephoned Mother from Grandmother's home to determine her whereabouts. Mother informed Webb she was in Chicago and that she could arrive at Grandmother's home within an hour to retrieve C.C. When she failed to show at Grandmother's house, Webb contacted Mother again. Mother initially told Webb she had been unable to find a ride to Indiana. Mother later admitted to Webb that she was serving a fourteen-month term of probation in the State of Illinois and was not allowed to leave the state without first obtaining permission from her Probation Officer.

As a result of Webb's assessment and Mother's failure to return for C.C. within the agreed upon time frame, LCDCS took C.C. into emergency protective custody. The next day, LCDCS filed a petition alleging C.C. was a child in need of services ("CHINS"). Mother thereafter admitted to the allegations of the CHINS petitions, and C.C. was so adjudicated.

A dispositional hearing was held in December 2008, after which the juvenile court issued an order formally removing C.C. from Mother's custody and directing that the removal date be made retroactive to the date C.C. was initially detained. The court's dispositional order also directed Mother to participate in a variety of services designed to enhance her parenting abilities and to facilitate reunification with C.C. These services included, among other things, parenting classes, individual counseling, a drug and

3

alcohol evaluation and any recommended treatment, a psychological evaluation and any recommended treatment, random drug screens, and supervised visits with C.C.

Mother's participation in reunification services was sporadic from the beginning and, despite brief periods of improvement, was ultimately unsuccessful. For example, service providers initially were unable to locate Mother due to her lack of housing and lack of communication with LCDCS. Although Mother eventually completed a psychological evaluation and began attending individual counseling sessions in mid-2009, she did not actively engage in the therapy services being offered. As a result, Mother was referred to a new therapist later the same year. A third referral for yet another therapist was made in 2010. In addition, Mother was reported as being "resist[ant]" to services being provided to her, such as parenting education. Transcript at 38.

There were also problems with Mother's participation in supervised visits with C.C., including Mother repeatedly cancelling and rescheduling appointments, struggling to stay awake during several visits, and not being attentive and/or not bonding with C.C. In June 2009, LCDCS attempted to address these issues by initiating an Interstate Compact for the Placement of Children ("ICPC")[2] with the State of Illinois so that C.C. could live with Mother in Illinois after Mother obtained housing with her paternal cousin. The ICPC was later denied, however, after an Illinois caseworker determined that Mother's cousin had a significant criminal record. The Illinois case worker was also concerned that Mother "did not appear to understand the parameters of her case plan" and

---

[2] Interstate placement of a child/children by an Indiana state agency must be accomplished in accordance with Indiana's ICPC policies which are codified at Indiana Code section 31-28-4-1 et seq.

4

could not provide any "proof" as to what she was working on in individual therapy. Id. at 44.

A second ICPC was initiated in early 2010 after Mother obtained independent housing in Illinois. Just days before the ICPC was completed in July 2010, however, Mother voluntarily left her residence and moved into a hotel because there had reportedly been a murder in her neighborhood. The ICPC was therefore cancelled due to Mother's lack of housing. Mother then returned to Indiana to live with Grandmother in August 2010.

Following her return to Indiana, Mother began participating in reunification services yet again. Mother quickly progressed to unsupervised visits and then overnight visits. By November 2010, however, LCDCS discovered Mother was no longer living with Grandmother but was living in a hotel in Illinois. Consequently, Mother's visitation privileges with C.C. reverted back to supervised visits. In December 2010, the permanency plan was changed from reunification to termination of parental rights and adoption. LCDCS thereafter filed a petition seeking the involuntary termination of Mother's parental rights to C.C. in March 2011.

An evidentiary hearing on the involuntary termination petition was held in early September 2011. During the termination hearing, LCDCS presented significant evidence establishing Mother had failed to successfully complete a majority of the juvenile court's dispositional goals despite having had a wealth of services available to her for approximately three years. Testimony from service providers indicated that although Mother eventually completed her parenting education classes and self-determined individual therapy goals, service providers reported that Mother had failed to incorporate

5

the parenting techniques she had been taught into her daily life. In addition, Mother was convicted of prostitution in October 2009, had not visited with C.C. since December 2010, and tested positive for marijuana both at the beginning of the CHINS case, and again on December 10, 11, and 14, 2010. A hair follicle drug screen collected on January 31, 2011, likewise came back positive for marijuana. As for C.C., LCDCS presented evidence showing the child was happy, thriving, and bonded to the pre-adoptive foster family that he had been living with for approximately three years.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. Several weeks later, on September 27, 2011, the juvenile court entered its judgment terminating Mother's parental rights to C.C. Mother now appeals.

**Discussion and Decision**

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here, the juvenile court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a juvenile court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

> (B)　that one (1) of the following is true:
>
>> (i)　There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)　There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)　The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)　that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a)

7

(emphasis added). Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) and (C) of the termination statute cited above.

## I. Conditions Remedied/Threat to Children's Well-Being

Mother claims the juvenile court's finding that Mother "did not engage in therapy services," was clearly contradicted by the testimony of LCDCS case manager Kandra Norris ("Norris"), who testified that Mother's individual therapy was "successfully closed" in April 2010. Appellant's Brief at 10. Mother further complains that the juvenile court (1) "failed to take into consideration that Mother was "homeless" and thus was unable to immediately begin therapy following C.C.'s removal, and (2) "chose to criticize" "rather than to applaud" Mother's decision to move out of her home and into a hotel just days before final approval of the second ICPC in light of the reported murder that occurred in that neighborhood. Id. Finally, Mother contends she is entitled to reversal because she complied with the case plan and obtained housing and employment prior to the termination hearing.

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Mother's allegations pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute. In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T.,

8

742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. A juvenile court may also properly consider the services offered to the parent by a county department of child services and the parent's response to those services as evidence of whether conditions will be remedied. Id.

Here, in terminating Mother's parental rights to C.C., the juvenile court made detailed findings regarding the many reunification services provided to Mother for approximately three years, as well as Mother's failure to participate in and/or benefit from these services. Specifically, the juvenile court acknowledged Mother's history of domestic violence with Grandmother as reported by local police personnel, her recurrent "homeless[ness]," and her "sporadic" attendance at scheduled visits with C.C. throughout the duration of the underlying proceedings. Appellant's Appendix at 2. As for Mother's participation in individual therapy, the court found Mother initially did not engage in the referred therapy services, that she was assigned to a new therapist in 2009 "to see if [M]other would engage in the services," and when Mother still did not engage in therapy services, was reassigned to a third therapist. Id. The juvenile court also noted that Mother had tested positive for marijuana both at the beginning of the CHINS case and then again in December 2010 and that the case plan had been changed from reunification to termination of parental rights due to Mother's "instability," "drug use," "inconsistency

9

with the visitations," lack of a "bond" with C.C., and the fact that Mother "was no closer to reunification with her child." Id. A thorough review of the record reveals that abundant evidence supports the juvenile court's findings.

During the termination hearing, LCDCS case manager Norris recommended termination of Mother's parental rights. In so doing, Norris informed the juvenile court that Mother had problems "gelling" with service providers, who reported that Mother would "resist services" that they were providing. Transcript at 38. Norris further described Mother's housing and "employment situation" throughout the underlying proceedings as "inconsistent" and confirmed that Mother was convicted of prostitution in October 2009. Id. at 56.

Although Norris acknowledged Mother had completed parenting classes, she further testified that Mother struggled with "falling asleep" during visits and "would not respond appropriately to [C.C.'s] acting out." Id. at 33. In addition, Norris clarified that despite the fact Mother's referral for individual therapy was eventually closed as "successful[]" in April 2010, Norris did not believe Mother "ever addressed the issues identified in the psychological [assessment] with her therapist," but rather made "goals for herself in therapy and those goals were to obtain housing . . . and employment" which Mother accomplished, but then lost again so she "had to start all over again." Id. at 55-56.

When asked why LCDCS requested that the permanency plan be changed from reunification to termination of parental rights, Norris answered, "The biggest concern was just the inconsistency with the visitations as well as the inconsistency with [Mother's] stability, and housing, and also at the time she tested positive for marijuana."

10

Id. at 59. In addition, visitation facilitator Sherri Johnson ("Johnson") confirmed that Mother continued to regularly miss scheduled visits with C.C. from April through August of 2010. Johnson likewise testified that Mother often appeared "sleepy" during visits, did "not engage[]" with C.C. during visits, and failed to consistently utilize the "parenting tools" taught to her regarding discipline. Id. at 90, 94.

As previously explained, a juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). After reviewing the record in its entirety, we conclude that abundant evidence supports the juvenile court's specific findings set forth above. Mother's arguments to the contrary, emphasizing her self-serving testimony concerning recently obtained housing and employment rather than the evidence of habitual instability and neglect cited by the juvenile court in its termination order, amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

## II. Best Interests

Next, we consider Mother's contention that LCDCS failed to present clear and convincing evidence that termination of her parental rights is in C.C.'s best interests. We are mindful that, in determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by the Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the juvenile court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the juvenile court also specifically found:

> Neither parent is providing any emotional or financial support for the child. Neither parent has a bond with this child. The child has been in placement since 2008 and has not been returned to parental care. Mother has not shown through the numerous services that she could be consistent with the services. Mother was given ample opportunities to bond with the child[,] which she failed to do. Mother's instability would be detrimental to the child's well-being. The child has bonded in the foster home. Neither parent has completed any case plan for reunification.
>
> * * * * *
>
> Additionally, the child deserves a loving, caring, stable, safe and drug[-]free home.
>
> It is in the best interest of the child and his health, welfare and future that the parent-child relationship between the child and his parents be forever fully and absolutely terminated.

12

Appellant's Appendix at 2. These findings, too, are supported by the evidence.

In recommending termination of Mother's parental rights, case manager Norris confirmed during the termination hearing that C.C.'s bond with Mother had "suffered" as a result of Mother's "instability issues" and inconsistent participation in visits with C.C. throughout the CHINS and termination cases. Transcript at 62. Norris further testified that she believed it would be "very detrimental" to C.C. if he were to be returned to Mother's care, and that C.C. needed a "stable and safe home that's free of child abuse and neglect." Id. at 63-64. In addition, Norris confirmed that C.C. had "bonded with his foster mom." Id. at 64.

Visitation case manager Brandy Cole likewise recommended termination of Mother's parental rights as in C.C.'s best interests, stating she observed "no bonding" between Mother and C.C. while assigned to the case. Id. at 100. In addition, C.C.'s foster mother confirmed that C.C. had been "progressing very well" since his removal from Mother's care in 2008. Id. at 106. The foster mother also explained that C.C.'s repeated "temper tantrums" and attention seeking behaviors had diminished since his removal from Mother, that C.C. had become "confident with the routine" in the foster home, and that C.C. had "grown up" with her biological daughter, who is six months older than C.C. and who C.C. views as a sibling. Id. at 106, 112.

Based on the totality of the evidence, including the recommendations and/or testimony of Norris, Cole, and C.C.'s foster mother discussed above, we conclude that there is ample evidence to support the juvenile court's findings, as well as its ultimate determination that termination of Mother's parental rights is in C.C.'s best interests.

Keeping in mind that the purpose of terminating parental rights is not to punish the parent but to protect the child, several additional factors weigh in favor of the juvenile court's conclusion that termination of Mother's parental rights is in C.C.'s best interests including: (1) C.C. is of a tender age and needs stability and permanency now; (2) C.C. is happy and thriving in a pre-adoptive foster home; and (3) C.C. is very bonded to his foster mother and siblings.

Since the time of C.C.'s removal, Mother has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show she is capable of providing C.C. with a safe, stable, and drug-free home environment. In addition, clear and convincing evidence supports the juvenile court's determination that termination of Mother's parental rights is in C.C.'s best interests. We therefore conclude that the juvenile court's judgment terminating Mother's parental rights is not clearly erroneous.

Judgment Affirmed.

BAKER, J., and KIRSCH, J., concur.